Filed 7/26/24  P. v. Rodriguez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>NANCY RODRIGUEZ,<br><br>　　Defendant and Appellant. | F086368<br><br>(Super. Ct. No. 1456746)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christroffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Nancy Rodriguez appeals from the denial of her Penal Code[1] section 1172.6 (formerly § 1170.95) petition for resentencing.  She contends the trial court erred by finding the People had proven she was guilty of murder under the direct aiding and abetting implied malice theory because such a finding was not supported by substantial evidence.  She further contends the court erred by failing to consider her youth at the time of the commission of the crime in determining whether she harbored implied malice.

Finding no error, we affirm.

## PROCEDURAL BACKGROUND

In March 2013, the grand jury returned an indictment charging appellant, along with eight codefendants, with conspiracy to commit murder (§§ 182/187, subd. (a); count 1) and premeditated murder (§ 187, subd. (a); count 2) of Erick Gomez.  The indictment further alleged the crimes were committed for the benefit of, at the direction of, or in association with the Sureño criminal street gang (§ 186.22, subd. (b)(1)(a)) and that at least one of the principals in the offense personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)).

The charges arose from a gang-related chase and retaliation attack perpetrated by several Sureño gang members and associates against a single Norteño gang member, during which he was shot and killed.  A lengthy trial was conducted.  The evidence showed, as described in more detail below, that appellant was present for and participated in the beating but did not shoot Gomez and likely did not know the shooter was going to shoot.  The People's theory was that appellant was guilty of murder based on the now-invalid natural and probable consequences doctrine.  The jury was unable to decide on a verdict, and the trial court declared a mistrial.

---

[1]     All further undesignated statutory references are to the Penal Code.

2.

A second trial commenced in May 2016. Before a jury was empaneled, a plea negotiation was reached between appellant and the People, and in June 2016, appellant pled no contest to voluntary manslaughter, as a lesser included offense of count 2, and admitted the gang enhancement, in exchange for a total prison sentence of 21 years and the dismissal of the balance of the charges.

On April 15, 2022, appellant filed a petition for resentencing pursuant to section 1170.95 (now § 1172.6),[2] and the court issued an order to show cause.

At the evidentiary hearing, the court stated it would take judicial notice of the trial transcript except for the testimony that was since deemed violative of *People v. Sanchez* (2016) 63 Cal.4th 665 and received several photographs into evidence.

The court delivered its ruling on May 15, 2023. The court found the People had proven beyond a reasonable doubt appellant could still be convicted of murder under the amended Penal Code sections as an aider and abettor who acted with implied malice. The court found appellant was a Sureño gang member who knew at least one coparticipant had a knife and participated in the retaliation beating "to ensure the violent attack, which was designed to be dangerous to human life."

## FACTUAL BACKGROUND

On February 10, 2013, the one-year anniversary of the murders of two Norteño gang members, a candlelight vigil was held at the scene of the murders, during which Norteño gang members tagged walls nearby commemorating the deaths of the two decedents, as well as with "187 CLS," which is a typical tagging signifying a rivalry or

---

[2] This was appellant's second section 1172.6 petition. Her first petition was denied because she was convicted of manslaughter rather than murder. She appealed from an order denying a petition for reconsideration of the initial denial, and while her appeal was pending, the law was amended to expressly include convictions for manslaughter as eligible for relief, and this court dismissed the appeal as moot, noting that appellant could bring another petition. (*People v. Rodriguez* (Apr. 5, 2022, F079641) [nonpub. opn.].)

murder threat against a rival gang, in this case "CLS," or Celeste Locos Sureños, a Sureño set.[3]

Four days later, on February 14, 2013, Sureño gang members placed "cross-out" graffiti over the Norteño graffiti. While they were doing this, they were jumped by a large group of Norteños, and two Sureño gang members, Jesse Sebourn (specifically, a CLS member) and Jeanette Robles were injured. Appellant, who was 18 years old at the time and a member of the Sureño set, Little Down Sureñas, or LDS, was present during this incident.

At one point that day, near the area of the graffiti, appellant and Robles got out of the vehicle in which they were traveling and started following two girls who were walking down the street. They stopped the girls, and Robles asked if they "bang[ed]." When one of the girls answered in the negative, appellant responded, "Good, this is sur trece." "Sur trece" is an expression that signals the person is with the Sureños gang. Then they got back in the car and left the area.

Later that day, Robles contacted another Sureño gang member, Dalia Mendoza, via text message and informed her of the jumping, and she, appellant, and Jenna Sebourn,[4] Jesse's sister and a Sureño associate present at the time Jesse and Robles got jumped, picked Mendoza up from her home. Mendoza testified for the prosecution as part of a testimonial agreement wherein she would receive a five-year sentence in exchange for her honest testimony.

---

[3]    On December 13, 2023, this court granted appellant's motion for judicial notice of the record on appeal filed in *People v. Rodriguez*, case No. F079641. The record includes the trial transcript on which the court relied in denying appellant's motion at issue in the present appeal, and the parties cite to the record in their briefs. The facts set forth in this opinion are primarily gleaned from this transcript.

[4]    Where defendants have the same last name, first names are used for clarity. No disrespect is intended.

4.

Mendoza testified at length regarding her perspective on what it meant to be in the Sureño gang and "down for the cause." She testified she was "jumped in" to LDS when she was around 11 years old about the same time as appellant. Mendoza testified that Norteños were the "enemies" of Sureños, and she wanted to kill them before they killed her. She felt proud when she hurt Norteños and did not feel remorse. She testified that she was close friends with appellant, and in her view, appellant was also "down for the cause." Appellant's moniker was "Tranquila." Mendoza testified about various acts of violence she had perpetuated against Norteño gang members in the past, including shooting into a crowd of them in the presence of appellant.

Mendoza stated that before leaving her home with appellant, Robles, and Jenna on February 14, 2013, Mendoza armed herself with a pocketknife so that she would be able to defend herself or "take [her] aggression out on [Norteños] for their actions" against Robles. Mendoza repeatedly stated during her testimony that she understood the plan that day was to "hunt" Norteños for retaliation for Jesse and Robles getting jumped. Mendoza testified she was prepared to do "anything," including using a weapon or shooting someone to effectuate the mission of revenge. She explained: "Our purpose was going to go to Celeste territory to get down with Norteños, to hunt them, and f[******] do whatever the hell we can to them if we find them for the purpose of retaliation because they physically injured Jesse and [Robles]."

From Mendoza's home, appellant, Mendoza, Robles, and Jenna went to a trailer park where other Sureños and Sureño associates were gathered, and Jesse was there talking about loading weapons into his and Jenna's vehicles. Jesse and Jenna's father, Michael Sebourn, was present and holding a pickaxe.

The group then went to different areas to try to encounter Norteños. Jenna was driving one car, with Robles, appellant, Mendoza, and Michael, still holding the pickaxe, as passengers. Another Sureño gang member and Jesse were in the other car. Later, a

5.

vehicle driven by Giovani Barocio joined them. At one point in the evening, Robles pointed out that there were Norteños in another car because it was flickering their lights. The other Sureño vehicles stopped, and Mendoza, Robles, and appellant got out of the car and ran towards the other car to, according to Mendoza, "see what was going on, what was happening," but upon realizing the other car had left, they got back into their vehicle.

Eventually, the group observed Erick Gomez walking with his girlfriend. Robles screamed out, "Hey, look there's a buster"[5] and told Jenna to make a U-turn. Mendoza was focused on "[g]etting out of car and handling the Norteño." Mendoza threw a gang sign associated with the Sureño gang toward Gomez, and Gomez returned a gang sign associated with the Norteño gang. This confirmed to Mendoza that Gomez was a Norteño gang member and thus the target for which she was hunting. Gomez and his girlfriend began to run away when they saw the Sureño vehicles. Several of the Sureños, including appellant, got out of the vehicles and chased after Gomez, and when they caught up to him, started beating him.[6] Mendoza testified she pulled her knife out as she was running toward Gomez. She had it out while she was hitting him, and it was visible to witnesses. Michael also had a knife, but it was in his sleeve. Appellant was at Mendoza's side and participated in the beating by punching and kicking Gomez.[7] Witnesses observed Gomez being stabbed and kicked in the head by the group, while Gomez attempted to fight back. One witness testified two or three of the attackers had weapons during the beating.

---

[5]    "Buster" is a derogatory term used by Sureño gang members to refer to a Norteño gang member.

[6]    Testimony established the number of attackers was approximately between six and 10.

[7]    One witnessed identified appellant as stabbing Gomez, but the trial court did not make such a finding.

6.

At one point during the attack, Barocio yelled, "Sur trece," and shot Gomez at least three times. Though witnesses testified Gomez was being stabbed repeatedly before being shot, Mendoza testified she did not stab Gomez until after he was shot and fell to the ground. The attackers began to flee shortly after the shots went off. Mendoza testified that, as she was continuing to stab Gomez after the shooting, appellant pulled at her sweater to go; Mendoza understood this not to mean that appellant wanted Mendoza to stop stabbing Gomez, but that she did not want Mendoza to stay at the scene and get caught.

Mendoza realized that during the attack, Gomez had stabbed her, and appellant, Robles, and Jenna took her to the hospital, where she received surgery.

The forensic pathologist who performed Gomez's autopsy testified he suffered three gunshot wounds and six stab wounds. One of the bullet wounds was the fatal wound. The pathologist opined the stab wounds could have been administered either before or after Gomez was shot. He further opined that the stab wounds alone, if left untreated, could have caused Gomez's death; however, because they accompanied the gunshot wounds, the pathologist considered them only a contributing factor to Gomez's death.

There was no evidence that any of the perpetrators had seen Barocio with a gun that night. No one heard Barocio announce that he was going to shoot Gomez, and no one heard anyone directing Barocio to shoot Gomez. However, Michael told police he heard Barocio comment earlier in the evening that he may have been armed with a gun or a knife.

Police later found several weapons in the vehicles driven in connection with the incident, including a machete, a baseball bat, knives, hammers, a golf club, and a lug wrench that would not fit the tires of the vehicle.

Appellant was eventually arrested and booked into jail with Jenna, Robles, and another Sureño gang member present on the night of the incident. The officer who booked them testified they were having casual conversation and joking around, and in his opinion, "they didn't fully understand the seriousness of what had just occurred."

## DISCUSSION

I. **Substantial Evidence Supported the Court's Finding that Appellant Was Guilty of Aiding and Abetting Implied Malice Murder**

### A. *Legal Background*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) As relevant here, the bill eliminated second degree murder liability predicated on the natural and probable consequences doctrine. (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2; *People v. Strong* (2022) 13 Cal.5th 698, 707, fn. 1.)

The bill also added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense, including, as relevant here, manslaughter, to seek resentencing. (§ 1172.6, subds. (a)-(c).) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder or manslaughter conviction. (§ 1172.6, subds. (c), (d)(1).) At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by

8.

the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

## B. Standard of Review

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

## C. Analysis

We conclude that substantial evidence supports the court's finding that appellant would be found guilty of murder under the aiding and abetting implied malice murder theory. After Senate Bill 1437 eliminated natural and probable consequences liability for second degree murder, " 'an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' " (*Reyes*, *supra*, 14 Cal.5th at p. 990.) As explained by the Supreme Court in *Reyes*:

9.

> "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.  [Citation.]  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, at pp. 990–991, quoting with approval in *People v. Powell* (2021) 63 Cal.App.5th 689.)

The *Reyes* court went on, " 'The reason why there is a dearth of decisional law on aiding and abetting implied malice murder may be the heretofore availability of the natural and probable consequences doctrine for second degree murder, which was easier to prove.… [T]he natural and probable consequences doctrine did not require that the aider and abettor intend to aid the perpetrator in committing a life-endangering act ….  What was natural and probable was judged by an objective standard and it was enough that murder was a reasonably foreseeable consequence of the crime aided and abetted.' " (*Reyes*, *supra*, 14 Cal.5th at p. 991, quoting *People v. Powell*, *supra*, 63 Cal.App.5th at p. 711, fn. 26.)

The primary thrust of appellant's argument is that there was no evidence that appellant knew specifically that Barocio was going to use the firearm to shoot and kill Gomez nor that she intended to aid the shooting.  We reject the assertion such a showing was necessary and conclude that substantial evidence supports that appellant knew she was aiding, intended to aid, and did aid a life-endangering act—the violent group beating of one person where dangerous weapons were used—with conscious disregard for human life.

*People v. Schell* (2022) 84 Cal.App.5th 437, a section 1172.6 case involving a gang-related group beating similar to that in the present case, is instructive. In *Schell*, several gang members beat the victim to death with a shovel and a bat, and the petitioner participated with his fists and feet. (*Schell*, at p. 440.) The trial court found the petitioner was guilty of implied malice murder. (*Id*. at p. 441.) On appeal, the appellate court adopted the People's argument that " '[the petitioner] did not need to specifically know that someone would strike [the victim] with [a shovel and bat] in that particular manner to be liable under an implied malice theory. It suffices that he knew he was aiding in a violent attack, knew dangerous weapons were being used against [the victim], and intended to stop [the victim] from escaping or defending himself by helping the perpetrators to surround and hit him.' " (*Id*. at p. 443.) The court concluded, "[the petitioner's] presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted an implied malice murder." (*Ibid*.)

The reasoning in another section 1172.6 case, *People v. Didyavong* (2023) 90 Cal.App.5th 85, is also instructive.[8] The appellate court in *Didyavong* rejected a similar argument that appellant makes here. There, the trial court found the petitioner was guilty of murder as an aider and abettor under an implied malice theory where the petitioner participated in a gang beating that resulted in a fatal shooting. (*Didyavong*, at p. 93.) On appeal, the petitioner argued the evidence did not support he harbored the requisite intent because he did not specifically know the shooter was going to shoot. (*Id*.

---

**8** We note the California Supreme Court granted review in *Didyavong* on June 28, 2023, S280047, and was held pending review in *Reyes*. When *Reyes* was decided, review in *Didyavong* was dismissed (*People v. Didyavong* (Oct. 18, 2023. S280047)) and the opinion became final (Cal. Rules of Court, rule 8.528(b)(2)).

at p. 98.) The *Didyavong* court determined the trial court could have made reasonable inferences to support that he knew the shooter was armed, but in doing so, noted that the petitioner's argument "presumes that an attack could only be deadly with the use of a gun, which is simply false." (*Ibid*.) The court went on:

> "Insofar as [the petitioner] means to suggest that his conduct does not show he harbored the requisite intent because the life-endangering act was the shooting and not the physical damage imposed by his use of a bat, we disagree. Although the cause of death was gunshot wounds, [the petitioner] aided the commission of the life-endangering act of the violent, life-threatening retaliation. [The victim] was kicked, beaten with a bat and a lead pipe, and stabbed multiple times with a screwdriver. [The petitioner] actively participated by beating [the victim] with a bat while [the victim] was held down. Even if [the petitioner] did not plan for murder to occur, his participation in the violent attack and his use of a weapon to beat [the victim] demonstrates his participation in the commission of a crime for which the natural consequences are dangerous to human life." (*Id*. at p. 99.)

Appellant relies on *Reyes* to support her assertion that the People were required to prove that appellant knew Barocio was going to shoot Gomez because, as appellant reasons, that was the act that proximately caused his death. In *Reyes*, the petitioner was with a group of gang members, and one of them showed the group a gun he was carrying. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) The group then rode their bicycles to the edge of territory belonging to a rival gang. (*Ibid*.) They encountered a vehicle, and the person with the gun shot the driver, killing him. (*Ibid*.) The petitioner was convicted of second degree murder and later petitioned for resentencing pursuant to section 1172.6. (*Reyes*, at p. 986.) The court in *Reyes* found the trial court erred in denying his section 1172.6 petition by failing to determine whether the petitioner knew the shooter "intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes*, at p. 992.)

12.

Appellant contends the same error occurred here, and that the relevant question here revolves around Barocio's act of shooting.

*Reyes* does not support appellant's argument. *Reyes* is factually distinguishable; it was a chance encounter between gang members and a passing car and did not deal with a group "hunt" and beating of a single person like the present case. As respondent points out, in *Reyes*, there was only one life-endangering act perpetrated against the victim—the shot fired that killed him—and this explains the *Reyes* court's choice of words in defining the life-endangering act as the shooting. We disagree with appellant that *Reyes* compels us to narrowly characterize the life-endangering act here as the shooting by Barocio.[9]

Applying the above principles, we conclude the trial court's findings here were supported by substantial evidence. Substantial evidence supports that appellant was a Sureño gang member and a willing and active participant in the plan to "hunt" Norteños in retaliation for the assault she witnessed against Jesse and Robles. Before the ultimate attack on Gomez, appellant had twice left the vehicle in which she was traveling in the ostensible pursuit of Norteños. When Gomez was spotted, appellant chased him along with several other Sureño gang members and associates. The court could reasonably infer she knew her fellow perpetrators would use deadly weapons against Gomez. Appellant was present when Jesse was discussing loading weapons in the car; at one

---

[9]    *People v. Curiel* (2023) 15 Cal.5th 433, another case appellant relies on for the same proposition, is similarly distinguishable. In *Curiel*, the section 1172.6 petitioner and a fellow gang member approached a group containing a rival gang member, a conflict occurred, and the petitioner's companion shot and killed the rival gang member. (*Curiel*, at p. 442.) The *Curiel* court concluded that the jury's finding that the petitioner acted with the intent to kill did not by itself make him ineligible for relief at the prima facie stage of a section 1172.6 petition. (*Curiel*, at p. 441.) The matter was remanded because the jury's finding did not include findings that the petitioner had the requisite mens rea for aiding and abetting. (*Id*. at p. 468.) Appellant primarily relies on it for its recitation of aiding and abetting liability set forth in *Reyes*. *Curiel* was at a far different procedural stage than the present case and is simply not apposite. In the present case, the trial court applied the elements of aiding and abetting implied malice murder to the facts before it.

point, she was sitting next to Michael who was holding a pickaxe; and during the attack, she was right next to Mendoza who was wielding a knife in clear view of the other perpetrators and witnesses. Some evidence supports the inference that appellant witnessed Mendoza stabbing Gomez before the shooting. Appellant was also aware of Mendoza's prior intense violence against Norteños. She aided in this life-endangering act of a group beating with dangerous weapons by participating in the beating by punching and kicking Gomez and helping to keep him from overtaking the attackers or escaping. Additionally relevant to her mental state, appellant did not aid Gomez in receiving medical care after he was shot; rather, she fled the scene, made sure that Mendoza fled with her, and accompanied Mendoza to the hospital to receive treatment for her injuries. When she was ultimately booked for Gomez's murder, she was observed as chatting and joking casually, supporting an inference she harbored a callous attitude toward what happened to Gomez.

In sum, substantial evidence supports that appellant (1) knew her coparticipants intended to perpetuate a violent group beating against Gomez because it was an orchestrated plan; (2) knew this act was dangerous to human life given that it was motivated by gang retaliation, and the perpetrators used dangerous weapons and blows to the head;[10] and (3) intentionally acted to assist in the act by helping to surround Gomez and participate in the beating. The totality of the circumstances support a finding that appellant acted with conscious disregard for human life.[11] Accordingly, for the foregoing

---

[10] See *People v. Cravens* (2012) 53 Cal.4th 500, 510–511 [violent force of defendant's sucker punch to victim's head was predictably dangerous to human life].

[11] We reject appellant's brief argument that her conduct did not satisfy the actus reus required for direct aiding and abetting liability because her conduct was neither the proximate nor concurrent cause of Gomez's death. We conclude that, like in *Schell* and *Didyavong*, appellant's conduct in helping to surround Gomez and participating in the beating was critical to keeping Gomez from fighting back or escaping. In so concluding, we disagree with appellant's assertion that because the petitioners in *Schell* and

reasons, we conclude the trial court's finding that appellant was guilty of aiding and abetting implied malice murder was supported by substantial evidence, and it did not err by denying appellant's petition.

## II. Remand for Consideration of Appellant's Youth is Not Appropriate

Appellant contends the matter must be remanded because the court "did not mention anything about appellant's youth when it denied her petition." To support her claim, she cites *People v. Pittman* (2023) 96 Cal.App.5th 400.

In *Pittman*, following the denial of a section 1172.6 petition, the appellate court remanded for consideration of youth where the court made no mention of youth despite appellant's counsel making no objection below. In that case, the appellate court rejected the People's argument that the issue was forfeited because "given the timing of the cases deciding that youth is a relevant factor bearing on mental state in section 1172.6 petitions, ' "it is unlikely … that the trial court [or the parties] could have known to consider [the appellant's] age and maturity level, particularly to the extent now required by cases issued after [the resentencing] hearing." ' " (*Pittman, supra*, 96 Cal.App.5th at p. 416.) The court pointed out the order was issued in December 2020, but the relevant appellate cases were not decided until 2021 or later. (*Ibid*.) Conversely, the order here was issued in May 2023, well after the relevant cases discussed in *Pittman* and in turn relied on by appellant. Thus, *Pittman* is not apposite.

Appellant does not refute respondent's contention her claim is forfeited; rather, in her reply brief, she appears to concede as such but requests that we review the issue anyway because "[s]he should not forfeit 21 years of her life without her youth being considered in whether that result is just." We decline to reverse based on this contention. We presume the court followed the law and took into consideration appellant's youth

---

*Didyavong* participated in their respective assaults to a greater extent than she did, those cases are distinguishable from hers.

despite not making an express comment on the topic.  (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398.)  Appellant has not rebutted this presumption.  To the extent that appellant is arguing the court's failure to make an express statement on the record was error, she forfeited her claim by failing to object below.

## DISPOSITION

The court's order denying appellant's petition for resentencing pursuant to section 1172.6 is affirmed.


                                           DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SMITH, J.

16.